**Electronically Filed**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BRIGETTE DEAN-HINES, Plaintiff, | Civil Action No. 2:05-cv-3486 |
| | Argument Date: September 12, 2005 |
| vs. | |
| ROSS UNIVERSITY SCHOOL OF VETERINARY MEDICINE; DeVRY, INC.; DAVID DEYOUNG, individually and in his capacity as Dean of Ross University School of Veterinary Medicine, Defendants. | |

# BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

D.R. 4137
**DAVID B. RUBIN, P.C.**
Attorney At Law
44 Bridge Street
P. O. Box 4579
Metuchen, New Jersey 08840
(732) 767-0440
Attorney for Plaintiff

**DAVID B. RUBIN**
On the Brief

# TABLE OF CONTENTS

Page

TABLE OF CITATIONS....................ii

INTRODUCTION....................1

BACKGROUND....................2

ARGUMENT

POINT I

THE STATE AND FEDERAL STATUTES RELIED UPON BY PLAINTIFF APPLY TO DEFENDANTS' OPERATIONS....................10

POINT II

DEFENDANTS HAVE FAILED TO DEMONSTRATE ENTITLEMENT TO DISMISSAL BASED ON FORUM NON CONVENIENS....................24

POINT III

WHILE PLAINTIFF MAY NOT SECURE RECOVERY UNDER BOTH NJLAD AND BREACH OF CONTRACT, DISMISSAL OF THE BREACH OF CONTRACT CLAIM IS PREMATURE.....31

CONCLUSION....................32

# TABLE OF CITATIONS

Page

Allstate Insurance Company v. Hague, 449 U.S. 302, 312-13 (1981) .....19

Babiker v. Ross University School of Medicine, No. 98 CIV 1429 THK, 2000 WL 666342 (S.D.N.Y. 2000), aff'd, 86 Fed. Appx. 457 (2nd Cir. 2004) .....29

Ballinger v. Delaware River Port Authority, 172 N.J. 586, 800 A. 2d 97 (2002) .....31,32

Bird v. Lewis & Clark Coll., 104 F. Supp. 2d 1271 (D. Or. 2000), aff'd, 303 F. 3d 1015 (9th Cir. 2002), cert. denied, 538 U.S. 923 .....13

Blakey v. Continental Airlines, Inc., 164 N.J. 38, 751 A. 2d 538 (2000) .....20

Bowers v. N.C.A.A., 151 F. Supp. 2d 526 (D.N.J. 2001) .....19,20

Bryant v. International Schools Services, Inc., 502 F. Supp. 472, 481-83 (D.N.J. 1980), rev'd on other grounds, 675 F. 2d 562 (3d Cir. 1982) .....21

Dominica Management, Inc. v. American University of Antigua College of Medicine, No. 04Civ.7675 (RMB)(FM), 2005 WL 1423338 (S.D.N.Y. 2005) .....28

Foley Bros. v. Filardo, 336 U.S. 281, 284-85 (1949) .....15

Dale v. Boy Scouts of America, 160 N.J. 562, 588-89, 734S A. 2d 1196 (1999), rev'd on other grounds, 530 U.S. 640 (2000) .....20

Grove City College v. Bell, 465 U.S. 555 (1984) .....12

Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S. Ct. 839, 91 L. Ed. 1055 (1947) .....25

Kanter at 302 .....12

King v. Bd. of Control, 221 F. Supp. 2d 783 (E.D. Mich. 2002) .....14

Lacey v. Cessna Aircraft Company, 932 F. 2d 170, 180 (3d Cir. 1991) ........................................ 24

Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981) ........................ 24,25

Rivera v. Cracker Barrel Old Country Store, No. 02-4160, 2003 WL 21077965 (D.N.J. 2003) .......................... 31

Rocker Management, L.L.C. v. Lernout & Hauspie Speech Products, No. Civ. A. 00-5965 (JCL), 2005 WL 1366025 (D.N.J. 2005) ........................................ 24

Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Limited v. Cavazos, 716 F. Supp. 638 (D.D.C. 1989) ........................................ 28

Santiago v. City of Vineland, 107 F. Supp. 2d 512 (D.N.J. 2000) ........................................ 31

Smith v. United States, 507 U.S. 197, 204 n.5 (1993) ........ 15

Soules v. Mount Holiness Memorial Park, 354 N.J. Super. 569, 574 808 A. 2d 863, 866 (App. Div. 2002) ........... 13

Spector v. Norwegian Cruise Line LTD., _____ U.S. _____, 125 S. Ct. 2169 (June 6, 2005) ........................ 17

United States v. Juda, 46 F. 3d 961, 967 (9th Cir. 1995) ..... 14

**Statutes**

N.J.S.A. 34: 19-8 ........................................ 31

29 U.S.C. § 794 ........................................ 12

20 U.S.C. § 1232g ........................................ 9

20 U.S.C. § 1681 ........................................ 15

## INTRODUCTION

Plaintiff Brigette Dean-Hines, a citizen of the United States and the Commonwealth of Kentucky, alleges in this action that she was wrongfully denied readmission to defendant Ross University School of Veterinary Medicine ("Ross") after a brief hiatus, in violation of her rights under New Jersey and federal handicap discrimination laws, and New Jersey common law. Ross and its parent company DeVry, Inc. ("DeVry"), also named as a defendant, move to dismiss the complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) or, alternatively, based on the doctrine of forum non conveniens.

Essentially, defendants contend that Ross is a St. Kitts corporation not qualified to do business anywhere in this country, whose activities are of no legitimate concern to the State of New Jersey or the United States. DeVry concedes that it is Ross's "ultimate parent entity," (Declaration of David M. Webster, ¶ 2), but would have the Court believe that it is only remotely tied to Ross through a string of "subsidiary and affiliate companies," id. at ¶ 4, and that Ross is an autonomous operation minding its own business in a foreign country several thousand miles away. As we will show, largely through defendants' own words, these assertions are not supported by the facts.

## BACKGROUND

Several facts appear undisputed. Ross is owned by Dominica Management, Inc. ("Dominica"), a New York corporation that also owns and operates Ross University School of Medicine on the island of Dominica in the West Indies.[1] In 2003, DeVry acquired Dominica's stock, and thereby assumed control of Ross, which is now referred to in DeVry's annual reports and government filings as a "division" of DeVry. Ross's administrative headquarters are located at 499 Thornall Street in Edison, New Jersey.

Defendants do not disclose in their papers what activities take place at Ross's New Jersey headquarters, but Dean-Hines's declaration accompanying this brief states from her own personal knowledge that this is where the enrollment and registration process takes place, and where tuition and fees are handled. All applications for admission are addressed to, and processed by, the New Jersey office. At the beginning of each term, Ross employees are sent to the St. Kitts campus from New Jersey to process students' enrollment there. Students sign the necessary paperwork in the presence of these New Jersey Ross employees. Formal complaints concerning the treatment of students at the St. Kitts campus are ultimately processed through the New Jersey

---

[1] After defendants filed their current motion, Dean-Hines cross-moved to amend her complaint to join Dominica as a defendant. The papers filed in support of that motion establish that Dominica is, in fact, registered to do business in New Jersey.

office. Paychecks to Ross staff are sent from the New Jersey office. (Declaration of Brigette Dean-Hines) And, as will be demonstrated below, officials at the New Jersey office were, at least to some degree, involved in the decision-making process being challenged in this litigation.

To further demonstrate Ross's close ties to New Jersey and the American veterinary services market, we offer the following background information about the school, drawn from defendants' own internet postings and government filings. According to the "Overview" section of Ross's website, http://www.rossvet.edu,

> . . . the Veterinary School, located on the Caribbean island of St. Kitts and Nevis, offers a Doctor of Veterinary Medicine (D.V.M.) degree. Students spend their first seven semesters on St. Kitts where they complete their pre-clinical studies. The pre-clinical curriculum is based upon the model provided by AVMA-accredited veterinary school pre-clinical curriculums. During the twenty-three years of the Veterinary School's existence, more than 1600 graduates have received their D.V.M. degree from Ross University. Graduates of Ross University have entered veterinary practice in a broad range of specialties and are licensed throughout the United States.
>
> * * *
>
> The student body of the Veterinary School is drawn from a broad range of U.S. educational institutions, including state universities and colleges.
>
> * * *
>
> Upon successful completion of the pre-clinical training, students return to the

> U.S. and begin three semesters of clinical training at one of the 23 Ross University-affiliated AVMA-accredited U.S. Colleges of veterinary medicine. These affiliations allow the fourth-year Ross student to complete their studies at U.S. veterinary schools with their degrees awarded by Ross University.

http://www.rossvet.edu/Veterinary__School/school__overview.html

(Declaration of David B. Rubin ("Rubin Dec."), Exhibit K).

DeVry's 2004 Annual Report leaves no doubt as to its intimate involvement in Ross's affairs, and Ross's pervasive contacts with the United States:

> The most exciting development of fiscal 2003, the acquisition of Ross University, provided DeVry with a high-quality entry into healthcare education. Throughout fiscal 2004, the management team smoothly integrated Ross and took steps to ensure that Ross University will remain among the leaders in supplying new physicians and veterinarians in the United States. New lecture and lab facilities have been built at the medical school campus, and plans are underway for new student housing, labs and student service facilities at the veterinary school campus. This facility expansion will support the enrollment growth objectives for Ross University.
>
> . . . Recently, Ross University added Michigan State University, Iowa State University and The Ohio State University as clinical training affiliates of Ross University's School of Veterinary Medicine. Our affiliations with these and other U.S.-based veterinary schools expand the opportunities available to Ross students and reflect the excellence of a Ross education.

> The outlook for Ross University is bright, as a number of factors continue to expand the need for high-caliber medical and veterinary professionals. Student capacity at U.S. medical schools has remained virtually unchanged for twenty years and capacity at U.S. veterinary schools is similarly limited. In addition, the aging U.S. population, an increased focus on the health of food animals and pets, and advances in medical treatment and technology has fueled demand for physician and veterinary services. (Rubin Dec., Exhibit A at 4-5)

DeVry incorporates Ross's income into its own consolidated financial statements included in its annual reports. Ross's President, Thomas C. Shepherd, is listed on the Ross website as both President of Ross and Executive Vice President of DeVry. These facts further signify that the two entities are, for all practical purposes, one in the same.

In a Form 10-K filed with the U.S. Securities and Exchange Commission for the fiscal year ended June 30, 2003, DeVry described the student body at the veterinary and medical schools as follows:

> The student population at both schools is selected from applicants who typically have (1) applied to U.S. medical or veterinary schools but failed to gain entry, or (2) elected not to apply to U.S. schools because of self-perceived shortcomings in their academic record but who still desire to become U.S. physicians or veterinarians. Admission standards at Ross closely parallel those of U.S. schools, but at somewhat lower levels of performance. ... Most Ross students are either citizens or residents of the U.S. (Rubin Dec., Exhibit D)

A July 18, 2005 posting by Ross for the position of "Vice President, Enrollment Management," plainly reveals the school's recruitment efforts directed at American college students:

> Based at our administrative headquarters in Edison, New Jersey and reporting to the President, Ross University, the Vice President of Enrollment Management will serve as a member of the Executive Committee and will be accountable for the successful operations and goal attainment of student recruitment for both Ross University School of Medicine and Ross University School of Veterinary Medicine. The Vice President will lead the enrollment management staff including marketing, admissions, applicant services, new student coordination, and alumni relations.
>
> Specifically, the Vice President will plan, schedule and evaluate all phases of the recruitment plan, including direct mail, campus visitation programs, regional receptions and workshops, alumni, college visitations, and other activities relating to the promotion and successful recruitment of new students for the University. ...
>
> . . . While basic science and pre-clinical courses are taught on our campuses in the Caribbean, Ross students complete their clinical rotations in the U.S. and are licenced to practice medicine in the U.S. after passing all prerequisite examinations. . . . (Rubin Dec., Exhibit L)

Ross has aggressively targeted college students throughout the United States, through execution of "articulation" or "acceleration agreements" with numerous colleges and universities, including Rowan and Fairleigh Dickinson Universities in New Jersey. A Ross press release posted on its

website, http://www.rossmed.edu/Ross_News/ARTICULATION_AGREEMENT/articulation_agreement.html, attributes the following statement to President Shepherd on the recent execution of such agreements with Fairleigh Dickinson:

> We are pleased to be partnering with Fairleigh Dickinson University because we have welcomed a number of Fairleigh Dickinson graduates to Ross University over the years. Ross University is proud to make the relationship between the institutions official and look forward to continuing to work with these fine students.

The press release goes on to state that

> Ross University will offer guaranteed admission into its Doctor of Medicine and Doctor of Veterinary programs to Fairleigh Dickinson graduates with Bachelor of Arts and Bachelor of Science degrees. In accordance with the articulation agreements, FDU graduates must meet and maintain specific requirements in addition to completingone of Fairleigh Dickinson University's approved programs. (Rubin Dec., Exhibit M)

Ross has also executed an "acceleration agreement" with Fairleigh Dickinson, guaranteeing admission to students meeting certain criteria after their junior year, who then receive their undergraduate degree from Fairleigh Dickinson after completing their first year of study at Ross. http://www.rossvet.edu/Ross_News/Acceleration_Agreement/acceleration_agreement.html.

Ross is a substantial beneficiary of U.S. government-backed student financial aid. According to the "Financial Aid" entry on

Ross's website, "[t]he United States Department of Education (U.S. DOE) has certified Ross University as an eligible institution for Title IV U.S. Federal Family Education Loan Program (FFELP) loans under the Higher Education Act of 1965, as amended (HEA)." As a condition of eligibility, Ross has executed a "program participation agreement" with the Department of Education, providing in pertinent part as follows:

> . . . The Institution understands and agrees that it is subject to and will comply with the program statutes and implementing regulations for institutional eligibility as set forth in 34 CFR Part 600 and for each Title IV, HEA program in which it participates, as well as the general provisions set forth in Part F and Part G of Title IV of the HEA, and the Student Assistance General Provisions regulations set forth in 34 CFR Part 668.
>
> ***The recitation of any portion of the statute or regulations in this Agreement does not limit the Institution's obligation to comply with other applicable statutes and regulations.***
>
> * * *
>
> By entering into this Program Participation Agreement, the Institution agrees that:
>
> (1) It will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA.... (Emphasis in original.) (Rubin Dec., Exhibit J)

Ross's Student Handbook of Academic Rules and Regulations (May 3, 2004 ed.)(Rubin Dec., Exhibit B), in effect when Dean-Hines reapplied for admission, explicitly refers to "U.S. Department of Education requirements" with which Ross must comply, id. at 5, and cites, among other legal authorities, "Laws of the United States" and "federal, state and local laws of the United States" that may apply to behavior such as the misuse of alcohol and illegal drugs. Id. at 30. In his declaration accompanying this brief, Dean-Hines' husband, Jason, a Ross staff member at the St. Kitts campus himself in 2004, represents that he attended a mandatory staff meeting in the summer of 2004 where a Ross corporate attorney from New Jersey stated, during an instructional seminar on sexual harassment, that the school was required to abide by American law in various respects or would lose its eligibility for federal financial assistance.

Plainly, Ross's status as an indirect recipient of federal funds through the Family Educational Loan Program renders it subject to any number of federal civil rights laws for the protection of its students. Ross itself acknowledges in its May 2005 Student Handbook that it is governed by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, and advises students that they may file complaints for non-compliance with the U.S. Department of Education's Family Policy Compliance Office in Washington. (Rubin Dec., Exhibit C at 8-9)

## ARGUMENT

The central issue before the Court on this motion is whether an American student at an American-owned and -run professional school financed by federally guaranteed student loans, that aggressively recruits American college students and returns them to the American veterinary profession upon graduation, is entitled to the protections of American disability discrimination law during a portion of her education that the school requires her to spend abroad. In a nutshell, defendants contend that extraterritorial application of American law to Ross's operations would violate accepted notions of due process and fair play, and that the substantive law and judicial system of St. Kitts offer all the protection that Ross students who are victims of handicap discrimination reasonably require. For the following reasons, we respectfully disagree on both counts.[2]

### POINT I
### THE STATE AND FEDERAL STATUTES RELIED UPON BY PLAINTIFF APPLY TO DEFENDANTS' OPERATIONS.

I.

We begin by acknowledging that which defendants tacitly concede - that New Jersey has personal jurisdiction over them

[2] Much of the argument that follows is drawn from a persuasive law review article by Professor Arlene S. Kanter, The Presumption Against Extraterritoriality As Applied To Disability Discrimination Laws: Where Does It Leave Students With Disabilities Studying Abroad?, 14 Stan. L. & Pol'y Rev. 291, 302 (2003) (referred to herein as "Kanter").

since Ross's administrative headquarters is located in Edison, and DeVry University operates a campus in North Brunswick. We agree with defendants that this alone does not necessarily dispose of the issues raised on this motion, but many of the same factors implicated in personal jurisdiction also bear on the fairness of applying New Jersey and federal substantive law. Thus, our analysis starts from the premise that both Ross and DeVry have active, ongoing, substantial contact with the State of New Jersey and the United States in general.

Moving forward from there, it is clear that Ross already considers its operations in St. Kitts to be governed by any number of American laws. As noted above, by accepting eligibility for Title IV, HEA guaranteed student loan funds, Ross agreed to comply with all manner of laws and regulations governing recipients of federal financial assistance. Its own handbook refers in several places to the applicability of U.S. law, and explicitly mentions FERPA. The program participation agreement does not explicitly mention Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act or the New Jersey Law Against Discrimination ("NJLAD"), but it is clear that these broad remedial pieces of legislation also apply to Ross's operations.

II.

A.

In 1973, Congress enacted the Rehabilitation Act, prohibiting discrimination on the basis of disability by federal agencies (Section 501), by programs that contract with the federal government (Section 503), and by recipients of federal financial assistance (Section 504). Section 504, 29 U.S.C. § 794, applies to institutions of higher education by protecting "otherwise qualified individual[s] with a disability in the United States" from disability-based discrimination "under any program or activity receiving Federal financial assistance ...." It is now well settled that federal financial aid to individual students, including FFELP loans, is sufficient to trigger coverage of statutes such as Section 504. See Grove City College v. Bell, 465 U.S. 555 (1984)(superseded by legislation); Kanter at 302.

The Americans with Disabilities Act ("ADA"), enacted in 1990, incorporates the protections of Section 504, but extends them to conduct by private entities as well. Its purpose is to allow people with disabilities "to boldly go where everyone else has gone before."[3] Title III of the ADA extends the reach of

---

[3] Kristina Hughes, Michigan State University, Michigan Rally Lauds Disabilities Act, U-Wire, July 27, 2000, 2000 WL 24499557 (quoting Al Swain, director of the Capital Center for Independent Living), quoted in Adam Milani, Go Ahead, Make My 90 Days: Should Plaintiffs Be Required to Provide Notice to

Section 504's prohibitions to private commercial facilities and places of public accommodation, including private colleges and universities.

The NJLAD also protects college and graduate students from handicap discrimination, with a definition of "handicap" considered by the New Jersey courts to be substantially broader than the scope of Section 504 or the ADA. Soules v. Mount Holiness Memorial Park, 354 N.J. Super. 569, 574 808 A. 2d 863, 866 (App. Div. 2002).

Neither Section 504, Title III of the ADA nor the NJLAD explicitly address their applicability to American students studying abroad in programs run or supervised by American-based colleges and universities, and very few cases have focused on the so-called presumption against extraterritorial application of state and federal law in that setting. The issue was addressed for the first time by an Oregon federal court in Bird v. Lewis & Clark Coll., 104 F. Supp. 2d 1271 (D. Or. 2000), aff'd, 303 F. 3d 1015 (9th Cir. 2002), cert. denied, 538 U.S. 923, discussed in Kanter:

> ... The Bird case involved an American student who used a wheelchair and alleged that she was denied accommodations during her participation in a college overseas program in Australia during the spring of 1996. The

---

Defendants Before Filing Suit Under Title III of the Americans with Disabilities Act, 2001 Wis. L. Rev. 107, 109, cited in Kanter, n. 92.

> student attended the program, but was not permitted to participate in all activities, and was carried rather than provided with alternate means of transportation and accessibility.
>
> The district court noted that the plaintiff was an American student who attended an American university's overseas program, taught by American faculty, employed by an American college, which is incorporated within the United States, and was doing business in the United States. In a lengthy opinion, the court concluded that based on these facts, the case was not barred by the presumption against extraterritoriality. [Order Ruling on Extraterritoriality, 2 (D. Or. Oct. 13, 1999)] As the court queried, "in what country and under whose laws is she entitled to relief?" Rejecting the college's argument in support of the application of the presumption against extraterritoriality, the court stated that if section 504 and the ADA were not applied extraterritorially, "students on overseas programs would become the proverbial 'floating sanctuaries from authority' not unlike stateless vessels on the high seas." And even a stateless vessel, the court continued, "may be subject to United States jurisdiction where defendants are all citizens or resident aliens of the United States." [citing United States v. Juda, 46 F. 3d 961, 967 (9th Cir. 1995).]
>
> The Court of Appeals for the Ninth Circuit upheld the district court's decision granting the plaintiff a remedy on a breach of contract claim, but denied her a remedy under section 504 or Title III of the ADA. The court of appeals found no need to reach the issue of extraterritoriality in its decision. [Kanter at 307-308 (footnotes omitted).]

In King v. Bd. of Control, 221 F. Supp. 2d 783 (E.D. Mich. 2002), a Michigan court held that Title IX could be applied extraterritorially to a sexual harassment claim by female

students at Eastern Michigan University, based on conduct occurring during a five-week study abroad program in South Africa. The relevant statutory language provided: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. ..." 20 U.S.C. § 1681. It was undisputed that the complained of actions took place outside the United States, and that the study abroad program was an "education program or activity" to which Title IX's proscriptions against discrimination would otherwise apply.

The court recognized the traditional presumption that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States[,]" 221 F. Supp. 2d at 787 (quoting Foley Bros. v. Filardo, 336 U.S. 281, 284-85 (1949)), and noted that the presumption is rooted in the notion that "Congress is primarily concerned with domestic conditions, . . . and . . . a desire to avoid unintended clashes between our laws and those of other nations which could result in international discord." 221 F. Supp. 2d at 787, citing Foley, 336 U.S. at 285; Smith v. United States, 507 U.S. 197, 204 n.5 (1993).

In searching the language of the statute for indications of Congressional intent, the court wrote: